### In re FISHER.
### No. 9051.

District Court, D. Maryland.
March 19, 1940.

Allan Eli Cohan, of Baltimore, Md., and Ellis Levin, of Baltimore, Md., for bankrupt.

Irving B. Grandberg, of Baltimore, Md., for trustee.

CHESNUT, District Judge.

The referee has filed a certificate of his findings of fact and conclusions of law which indicates that a flagrant fraud has been perpetrated upon the creditors of the bankrupt. After stating the facts in some detail and discussing the applicable law the referee concluded his certificate as follows:

"The bankrupt has failed to account for property having an invoice value of $32,-073.10. It was shown to be in his possession shortly before bankruptcy. He offered no explanation as to what became of it. The conclusion that it was in the possession of the bankrupt or of his agent Roth at the time of bankruptcy is clearly justified by the evidence.

"*It does not appear, however, that there is sufficient basis for the conclusion that the bankrupt had possession of this property either on October 18, 1939, when the hearing was held, or at the present time.* The presumption of continued possession after bankruptcy is so weakened by the long period elapsed that it cannot be accepted as constituting clear proof. The Trustee's right to a turn-over order has been defeated by the completeness with which the bankrupt has made way with the merchandise and with his books and records by his failure to make any explanation as to what was done with the property, and by his good luck (or skill) in escaping service by the marshal of the petition for the turn-over order. This is unfortunate from the point of view of the creditors. It does not, however, justify the entry of a turn-over order against the bankrupt in the absence of convincing evidence of possession of the property.

"An order will be entered overruling the petition." (Italics supplied)

I find myself unable to concur in the referee's conclusion on the facts stated. On the contrary, the proper conclusion

from the facts seems to me to be very clearly that the bankrupt should be held accountable for either the merchandise itself or the proceeds of the disposition thereof. In this connection reference should be made to a new provision of the Chandler Bankruptcy Act of 1938, § 21(l), 11 U.S. C.A. § 44(l), which reads:

"In any proceeding under this Act [title] against a bankrupt for an accounting by him for his property or the disposition thereof, or to compel a turn-over of property by him, if his books, records, and accounts shall fail to disclose the cost to him of such property sold by him during any period under consideration, it shall be presumed, until the contrary shall appear, that such property was sold at a price not less than the cost thereof to him."

The substance of the facts as found by the referee is as follows: The bankrupt is a man forty-two years of age who had been engaged for a period of ten years or more in the business of selling used cars, and other merchandise. He opened the particular business here involved on or about January 15, 1938 in a store at 609 W. Baltimore Street, investing, he says, $8,000 of his own money, and dealing at wholesale in miscellaneous merchandise consisting largely of cosmetics. On April 19, 1938, he gave a statement to Dun & Bradstreet, Inc., that he had on hand merchandise to the value of $9,575. Thereafter, and prior to the bankruptcy petition on June 28, 1938, he purchased additional merchandise at a cost of $26,333.51. The merchandise on hand at the time of the bankruptcy was appraised at $3,791.19. During this period he had three comparatively small bank accounts, with no credit balance in any of them on June 28, 1938. The total deposits during this period were about $10,000, with an average bank balance of less than $500. The merchandise claims filed after bankruptcy exceeded $32,000. After the bankruptcy the receiver found two empty filing cabinets in the bankrupt's place of business but no records of any kind and no books.

In purported explanation of the disappearance of all his bookkeeping records and the large amount of unaccounted for merchandise, the bankrupt offered a seemingly incredible explanation which was not accepted by the referee as true. The bankrupt's statement in this connection (as summarized by the referee) was that about two months after he had opened the new business "a man named Jack Roth, whom he had not previously known, came into the store selling combs and that two or three weeks later, after seeing Roth on five or six occasions, he (the bankrupt) made Roth manager of his business at a salary of Fifty Dollars ($50.00) a week plus a bonus. According to the bankrupt's testimony Roth was not a partner but as manager had complete charge of the business thereafter and until June 18, 1938, without any effective control or supervision by the bankrupt."

The bankrupt further testified that he was frequently absent from the place of business; that he permitted Roth to sell the merchandise from time to time and to keep the books; and that "about the middle of June, 1938, he asked Roth for a statement as to the condition of the business, and that Roth said he would take the books for examination to a friend of his who was a certified public accountant and would give the bankrupt a statement in a few days; * * * that the last time he saw Roth was on June 18, 1938, in the middle of the day and that Roth was then leaving with a truck load of merchandise * * * that the last communication he had from Roth was a telegram sent from New York on June 23, 1938; * * * The telegram read as follows:

" 'Federal Sales Company,
" '609 W. Baltimore Street

"All papers and bills at accountants office Collecting all money due us taking checks and cash Will sell razors and merchandise today Don't worry Will bring in enough money

"Jack Roth'."

It also appeared that after Roth's alleged departure on June 18th, the bankrupt received some other deliveries of merchandise for which he could give no accounting and as to which he had no records of disposition. Nothing more has ever been heard from Roth or the merchandise or the books, and there is no satisfactory evidence as to Roth's identity, or previous residence or associates; although the trustee does not deny the possibility of the existence of some such person in association with the bankrupt. The bankrupt is an individual but otherwise the situation is not unlike that described by Circuit Judge Augustus N. Hand of the Second Circuit in Re Pinsky-Lapin & Co., 2 Cir., 98 F.2d 776, 778:

"The case is apparently the old and conventional one of the officer of the bankrupt corporation who secures for it enlarg-

ed deliveries in the last few weeks preceding bankruptcy, appropriates the proceeds personally and attempts to cover his tracks by false entries and alleged payments to unidentified creditors or those whom he does not produce as witnesses."

I understand from the referee's certificate that he declined to give credence to the bankrupt's purported explanation of the disappearance of his books and merchandise, as the referee said:

"I find the statements contained in the foregoing summary of evidence, except those therein stated to have been made by the bankrupt, to be true."

On October 17, 1938 the trustee in bankruptcy petitioned the referee for a turnover order for unaccounted for merchandise in the amount of at least $33,532.43, in value. On this petition the referee signed a show cause order which was served upon the bankrupt's then acting attorneys who, however, promptly asked leave to strike out their appearance. This was granted by the referee, and shortly thereafter the trustee obtained another show cause order to be served upon the bankrupt personally; but although it is said diligent efforts were made to effect service, the marshal did not succeed in making actual service on the bankrupt until nearly a year thereafter, on September 16, 1939. It is quite inferable that the bankrupt was successfully evading service during this period. Thereafter new counsel for the bankrupt filed an answer in general denial of the possession by the bankrupt of the missing property. Testimony on the petition and answer was afterwards taken by the referee, including testimony of the bankrupt.

█ The referee's conclusion of law, after a review of the more important relevant decided cases, was that the trustee in bankruptcy had not sufficiently shown the bankrupt had possession of the missing property at the time of the application for the "turn-over" order. See In re Pinsky-Lapin & Co., 2d Cir., 98 F.2d 776; May v. Henderson, 268 U.S. 111, 120, 45 S.Ct. 456, 69 L.Ed. 870. Proof as to this may, however, be circumstantial as well as direct; and the trustee is not obliged to prove the fact beyond a reasonable doubt, but only by clear and convincing evidence, exceeding a mere preponderance. Oriel v. Russell, 278 U.S. 358, 49 S.Ct. 173, 73 L.Ed. 419; Free v. Shapiro, 4 Cir., 5 F.2d 578; In re Hoffman, 7 Cir., 17 F.2d 925. In this (Fourth) Circuit, the fullest exposition of

the applicable law is to be found in Judge Rose's opinion in Kirsner v. Taliaferro, 4 Cir., 202 F. 51. At page 58, of 202 F., he said, quoting from In re Meier, 8 Cir., 182 F. 799:

"The settled rule is that, when property of a bankrupt estate is traced to the possession of one who receives it upon the eve of the bankruptcy of its owner, it is presumed to remain in his possession or under his control until he satisfactorily accounts to the court of bankruptcy for its disposition or disappearance; that the burden is upon him to satisfactorily so account for it; and that he cannot escape an order for its surrender by simply denying under oath that he has it, or that it is the property of the bankrupt estate."

█ In the present case the referee found on what appears to have been clear and convincing evidence, which indeed is hardly disputed, that the bankrupt did have in his possession very shortly before the bankruptcy more than $30,000 worth of merchandise which is unaccounted for. It is true he offered an explanation to the effect that he had been robbed by his agent and manager, the alleged Jack Roth, who had also made off with the books of account. But the bankrupt's testimony on this point was rejected by the referee, with the result that the bankrupt has failed to satisfactorily explain the disappearance of the merchandise. The very nature of the explanation given by the bankrupt makes it inherently incredible, but in addition thereto, conceding its bare possibility of truth, there is apparently lacking corroboration or support for the statement in detail, testimony as to which it would seem ought to have been reasonably possible in corroboration of the bankrupt's statement, with respect to his relations with the alleged Jack Roth.

█ It is, of course, entirely possible and indeed probable that this missing merchandise may no longer be within the actual or constructive possession or control of the bankrupt. It would seem more likely that long before this it has been converted into cash. But in that event the bankrupt should be required to pay over the cash proceeds therefrom, and until some other credible explanation is given, it should be assumed, as now required by the Chandler Act, that it was sold at not less than cost. The turn-over order in the case can well take account of this possibility. See for illustration the form of order in the Kirs-

ner case, supra. See also Cooper v. Dasher, 290 U.S. 106, 54 S.Ct. 6, 78 L.Ed. 203.

 In the Kirsner case, Judge Rose was at great pains to carefully point out with what care and caution district judges should properly proceed in matters of this kind with respect to contempt orders against a bankrupt who fails to comply with the requirements of a turn-over order. But this case has not yet arrived at that stage. The turn-over order is itself merely a step in the administration of bankruptcy procedure. If the bankrupt fails to comply with a proper turn-over order, contempt proceedings may be brought against him. Such proceedings are civil and not criminal in nature. Kirsner v. Taliaferro, supra, 202 F. page 60; Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797, 34 L.R.A.,N.S., 874; Oriel v. Russell, 287 U.S. 358, 363, 49 S.Ct. 173, 73 L.Ed. 419.

The facts of this case as found and stated by the referee seem to be even stronger in support of the turn-over order than in Kirsner v. Taliaferro, supra, and In re Pinsky-Lapin & Co. supra, and comparable at least to those stated in Cooper v. Dasher, supra, which the Supreme Court held were quite sufficient to justify the turn-over order.

 The case will be referred back to the referee with instructions to grant the petition of the trustee in bankruptcy for a turn-over order. Consideration should be given to the proper scope and wording of the order to be made. The parties have not indicated any wish to adduce additional evidence, but the referee should feel entirely at liberty to take further relevant evidence, if any, offered by either party and particularly by the bankrupt. It is recognized that the making of a turn-over order is a serious step in a bankruptcy proceeding which may involve further important consequences; and before it is finally made the fullest opportunity should be given to the parties, and especially to the bankrupt, to submit all available testimony that can have a proper bearing on the issue. Even if the bankrupt still fails to give any credible explanation of the disposition of the missing merchandise and books, or otherwise to account therefor, still the turn-over order should not be passed if the referee is satisfied from further evidence that it is entirely beyond the power of the bankrupt to comply with the order. May v. Henderson, supra, 268 U.S. page 120, 45 S.Ct. 456, 69 L.Ed. 870; Kirsner v. Taliaferro, supra,

202 F. page 60. It is not meant to say generally that the burden of proof is on the bankrupt to establish affirmatively his inability to comply. On the contrary, the burden is primarily on the trustee to show the bankrupt's ability to comply; but when the trustee has affirmatively by clear and convincing testimony established the recent possession by the bankrupt of the missing merchandise, then the burden shifts to the latter to account for its non-production, or to show inability to comply with a "turn-over" order. That is the situation as it exists at the present time in this case. But if the bankrupt has some further acceptable explanation to give, the referee should carefully consider it. The referee seems to have attached considerable importance to the lapse of time between the bankruptcy on June 28, 1938 and the application for the turn-over order about a year later, as bearing on the presumption as to continued possession. While this may apply to the merchandise itself, it does not equally apply to the probable proceeds of the disposition of the goods. The amount in value is entirely too large to indulge the inference that it would have been expended for ordinary living expenses.

The papers in the case are hereby referred back to the referee with instructions to proceed in accordance with this opinion.